IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ANTHONY KELLY, GREGORY COOK, )
GERALD FAIR, JACK HOFFMAN, )
CHRISTOPHER KUNKLE, )
CHAD LALLIER, DAVID PLUNKETT, )
SAMUEL REYES, FREDERICK RUFF, )
And MICHAEL SHARPE, )
)
    Plaintiffs, )
)
v. ) Civil Action No. 1:22-cv-196
)
THE CITY OF ALEXANDRIA, )
)
    Defendant. )

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Plaintiffs' and Defendant's cross-motions for summary judgment.

Plaintiffs are or have been Fire Department Battalion Chiefs ("BCs") for the Defendant here, the City of Alexandria ("the City"). From 2019 to 2022, when Plaintiffs worked overtime hours, the City paid them their normal hourly rate, or what is referred to as their straight-time rate. Plaintiffs claim they were owed the equivalent of one-and-a-half (1.5) times their straight-time rate for those overtime hours, in other words overtime pay, under the Fair Labor Standards Act ("FLSA"). The FLSA "guarantees that covered employees receive overtime pay

when they work more than 40 hours a week[,]" <u>Helix Energy Sols. Grp., Inc. v. Hewitt</u>, 143 S. Ct. 677, 677 (2023), or for fire protection employees with 28-day work periods, when they work more than 212 hours over 28 days. 29 U.S.C. § 207(k); 29 C.F.R. § 553.201. Plaintiffs also seek additional damages under the Virginia Wage Payment Act ("VWPA") and Virginia Overtime Wage Act ("VOWA"). The City argues that Plaintiffs are exempt from the FLSA's overtime pay requirement because of their compensation structure and the nature of their work duties.

As BCs, Plaintiffs cycle between two roles with different work responsibilities and schedules: one operational and the other administrative. All Plaintiffs have served either as operational BCs or administrative BCs or both at some point within the relevant 2019-2022 period.

Each operational BC is responsible for commanding a Battalion, consisting of 4-5 firehouses, for one of three shifts. When commanding a Battalion, operational BCs are responsible for supervising 25-35 employees, managing millions of dollars' worth of equipment, taking operational command of emergency incident scenes, and observing lower-ranking officers who work at such scenes.

Administrative BCs hold one of four assignments: Special Operations, Professional Responsibility, Logistics, or Community Risk Reduction. In Special Operations, administrative BCs

2

supervise the Fire Department's readiness to respond to emergencies involving hazardous materials, technical rescue, or water rescues. They also represent the City to numerous regional and working groups with officials of federal, state, and other local governments. In Professional Responsibility, administrative BCs oversee the Fire Department's training programs and supervise both permanent and temporary training personnel, including recruits at training school. In Logistics, administrative BCs supervise the Fire Department's supply, facilities maintenance, and apparatus repair teams, all of which regularly interact with vendors in their respective areas. In Community Risk Reduction, administrative BCs supervise the City's fire inspectors, fire marshals and public information officer. They also represent the Fire Department and the City externally on fire-related safety issues. In sum, all administrative BCs except for those in Special Operations, supervise multiple levels of employees who report to them, and all administrative BCs except for those in Professional Responsibility, represent the City to outside parties or supervise such work.

Operational BCs work 24-hour shifts on a rotating 9-day schedule and are paid every two weeks. They are expected to be scheduled, on average, 112 hours of work each two-week pay period. The City calculates an hourly rate of pay by taking the

3

annual salary they quote to BCs and dividing it by the expected number of scheduled work hours throughout the year. From 2019-2022, payroll records indicate that operational BCs were paid at least 106 hours' worth of pay each pay period, even when they worked less than 106 hours in the relevant two-week period. When operational BCs worked less than 106 hours, the City would ensure their minimum pay by either deducting from their paid leave or any hours worked above 106 in the following pay period to cover the difference. The City represents that this was done to smooth and reduce any variations in the pay of operational BCs when they were scheduled less than 106 work hours in a pay period.

Administrative BCs are always scheduled 40 hours of work per week, for which they are paid according to an hourly rate calculated using the same procedure mentioned above. The City represents that they are in effect guaranteed 80 hours' worth of pay each biweekly pay period. Payroll records indicate that administrative BCs were always scheduled a minimum of 40 hours of work per week and were therefore always paid a minimum of 80 hours' worth of work every two weeks.

From 2019-2022, Plaintiffs' total annual compensation ranged from $170,105 to $237,761. Their annual compensation for regularly-scheduled work (plus paid leave) ranged from $120,088 to over $150,000. Both parties agree that Chief Kelly did not

4

initially receive pay for the overtime hours he worked in July of 2022. Payroll records indicate this shortfall was corrected with a follow-up payment in August of 2022.

On February 23, 2022, Plaintiffs filed suit against the City alleging violations of the FLSA, VWPA, and VOWA. On January 24, 2023, the City filed a motion for summary judgment raising the affirmative defense that Plaintiffs were exempt from protection under the FLSA. On February 7, 2023, Plaintiffs filed a partial motion for summary judgment, arguing that only the issue of damages need be resolved at trial. After both motions were fully briefed, this Court ordered supplemental briefing in light of the recent Supreme Court decision in Helix clarifying one of the conditions for exempt status under the FLSA. 143 S. Ct. at 685. Accordingly, the parties have submitted additional filings addressing Helix and this Court finds this case is ripe for summary judgment.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will be granted unless "a reasonable jury could return a verdict for the nonmoving party" on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An otherwise properly supported summary judgment motion will not be defeated by the existence of a dispute as to immaterial

facts; only disputes over facts that might affect the outcome of the trial will properly preclude the entry of summary judgment. Id. at 248. The claimant bears the initial burden of proof as to each and every element of his claims. See United States ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama, 104 F.3d 1453, 1462 (4th Cir. 1997). "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal citation omitted) (internal quotation marks omitted); Hoschar v. Appalachian Power Co., 739 F.3d 163, 169 (4th Cir. 2014).

The City has argued various exemptions apply that prevent the Plaintiffs from recovering under the FLSA. This Court will focus its analysis on the "highly compensated" employee (hereinafter "HCE") exemption given the parties do not dispute that its basic annual compensation threshold has been met and it otherwise bears the most relaxed test for exempt duties.

To qualify as an HCE under 29 C.F.R. § 541.601, an employee must be paid on a salary basis, meet certain annual compensation thresholds, and "regularly and customarily perform[]" just "one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee" as laid out in 29 C.F.R. §§ 541.100 et seq., .200 et seq., and .300 et seq.

6

A defendant employer carries the burden of proving an exemption applies, which is an affirmative defense under the FLSA. Clark v. J.M. Benson Co., Inc., 789 F.2d 282, 286 (4th Cir. 1986).

The first and principal issue in this case is whether Plaintiffs have been paid on a salary basis, a prerequisite for HCE status. § 541.602(a) and § 541.604(b) provide two alternative tests for determining whether an employee is paid on a salary basis. Helix, 143 S. Ct. at 683-84.

Under § 541.602(a), employees are paid on a salary basis when they "receive the full salary for any week in which they perform[] any work without regard to the number of days or hours worked." As the Supreme Court in Helix explained, that full salary must be a predetermined amount whose calculation is independent of the number of days or hours worked. 143 S. Ct. at 686. If that amount is "always a function" of how many days or hours labored, or can only be calculated after counting the number of days or hours worked in a week, then it fails § 602(a)'s requirements. See id. In other words, the inquiry revolves around which unit of time is used to calculate pay, and that unit of time must be "a week or less frequent measure." See id. at 687. Furthermore, that predetermined amount cannot be "subject to reduction because of variations in the quality or quantity of the work performed." § 541.602(a).

7

In contrast, § 541.604(b)'s salary basis test allows for employees' earnings to be calculated on an hourly, daily, or shift basis so long as they are additionally provided "a guarantee of weekly payment approximating what the employee usually earns." See Helix, 143 S. Ct. at 689. This test can be broken down into two steps. First, the guaranteed portion of the employee's earnings must be at least $684 a week. § 541.604(b). Second, that guarantee "must bear a 'reasonable relationship' to the 'amount actually earned' in a typical week." Helix, 143 S. Ct. at 684 (quoting § 541.604(b)). A typical week's earnings is "roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek." § 541.604(b). Therefore, while § 602(a) is limited to weekly-rate employees, § 604(b) addresses daily- and hourly-rate employees because it imposes additional requirements that ensures both tests are non-overlapping. See Helix, 143 S. Ct. at 689.

The Court finds that Plaintiffs are hourly-rate employees that satisfy § 604(b)'s salary basis test.

It is undisputed that in all two-week pay periods, when operational BCs worked more than 106 hours and administrative BCs worked more than 80 hours, their earnings directly correlated with the number of hours worked. Therefore, inconsistent with § 602(a)'s salary basis requirements, it

cannot be said Plaintiffs received the full salary for work in any week without regard to the number of hours they worked, because their pay for those weeks with overtime hours was always directly a function of those hours worked. In this sense, Plaintiffs are best characterized as hourly-rate workers.

Nevertheless, as the Supreme Court has made clear, hourly-rate workers can still be paid on a salary basis under § 604(b) so long as they 1) also receive a weekly guarantee of at least $684 and 2) that guarantee bears a reasonable relationship to their actual earnings in a normal scheduled workweek. Both conditions are met here.

The Court finds Plaintiffs received weekly guarantees of a sufficient amount. Payroll records indicate that apart from their compensation for overtime hours, Plaintiffs were guaranteed 106 hours worth of pay every two weeks as operational BCs and 80 hours worth of pay every two weeks as administrative BCs. Under the various hourly rates for operational BCs and administrative BCs from 2019 to 2022, it is undisputed that both 106 and 80 hours worth of pay here easily exceeded the $684 weekly minimum for salary basis under § 604(b). Plaintiffs argue these guarantees were in fact being provided on an hourly, not a weekly basis, given that they were computed by multiplying 106 hours and 80 hours by hourly rates. However, these calculations were not an actual function of the hours worked by Plaintiffs.

9

So even if the guaranteed portions of Plaintiffs' earnings had to be provided on a salary basis under § 602(a)'s standard, their guarantees would still be compliant because they were provided without regard to hours worked. This is illustrated by the fact that operational BCs were still paid at least 106 hours worth of pay even when they worked fewer than 106 hours in a two-week work period. Thus, the situation here is distinct from Helix, where the employee's pay was completely determined by the number of days worked in a week. See 143 S. Ct. at 686 ("A daily-rate worker's weekly pay is always a function of how many days he has labored. It can be calculated only by counting those days once the week is over—not, as § 602(a) requires, by ignoring that number and paying a predetermined amount.").

The Court also finds there is a reasonable relationship between these guarantees and actual earnings in a normal scheduled workweek. For operational BCs, it is undisputed that the maximum amount that could be earned for scheduled hours in a normal workweek was 72 hours worth of pay. Given that guarantees were paid over two-week pay periods, operational BCs were effectively guaranteed 53 hours worth of pay for one normal scheduled workweek. That means the maximum possible ratio of their pay for normal scheduled hours earnings in a week to the guaranteed amount is 72 divided by 53, which equals 1.3585. According to the Department of Labor ("DOL"), a ratio under 1.5

10

indicates the guarantee bears a reasonable relationship to actual earnings in a normal scheduled workweek. See DOL Opinion Letter FLSA 2018-25, 2018 WL 5921453, at *2 (Nov. 8, 2018). The ratio for operational BCs remains well below 1.5 even if calculated over a two-week or four-week work period. The ratio for administrative BCs is also well below 1.5 because each week they received 40 hours of scheduled work along with 40 hours worth of guaranteed pay, resulting in a ratio of 1. Plaintiffs' calculations of all these ratios differ because they include overtime pay when determining actual earnings in a typical week. But that approach ignores § 604(b)'s language which limits actual earnings in a typical week to what is earned in a "normal scheduled workweek," which should exclude pay for non-scheduled work hours.

  Finally, in one last attempt to defeat salary basis, Plaintiffs argue these 106 and 80 hour minimums cannot be considered guarantees because they were never explicitly promised in any contract. However, whether a guarantee exists or not depends on if an employer has a practice of subjecting their employees to improper salary deductions based on the quality or quantity of their work. See Coates v. Dassault Falcon Jet Corp., 961 F.3d 1039, 1048 (8th Cir. 2020) (finding that § 604(b)'s language of guarantee should be "read as shorthand statement" of 602(a)'s test for improper deductions). It is significant that

11

when addressing requirements for being paid on a salary basis, the revised regulations replaced the phrase "employment contract" with "employment arrangement" in § 604(b). See id. at 1045, n.6. Moreover, to demonstrate the nonexistence of an identified guarantee, it is the plaintiff's burden to provide evidence of a practice of improper reductions. See id. at 1047.

Here, payroll records confirm that no such improper deductions took place as BCs were always given at least 106 or 80 hours worth of pay regardless of the hours worked. The fact that paid leave hours were sometimes deducted to ensure those guarantees is irrelevant, as § 541.604(a) and the caselaw make clear that deductions from paid leave in this manner are not improper and cannot jeopardize salary basis status. See 69 Fed. Reg. 22,122, at 22,178-79 (2004)(citing cases and authorities). Moreover, the temporary shortfall in Chief Kelly's pay did not constitute an improper deduction because it never affected the guaranteed portion of his earnings and was quickly corrected. Because of the paucity of evidence here, no reasonable jury could conclude Plaintiffs were subject to a practice of improper deductions. Therefore, the Court finds the City did in fact provide guarantees of 106 and 80 hours worth of pay to Plaintiffs every biweekly pay period.

Because the Court finds that Plaintiffs meet both conditions for salary basis status under § 604(b), there are two

remaining issues as to whether they can be considered exempt as HCEs. First, there is the question of whether their annual compensation meets the required threshold for highly compensated employees under § 541.601(a). The parties do not dispute that the total annual compensation received by Plaintiffs crosses the HCE threshold even after it was raised in 2020. Second, the Court must determine whether at least some of the regular duties of operational and administrative BCs are administrative or executive in nature. Plaintiffs have not provided any arguments as to why their duties should not be considered administrative or executive in nature, but the Court will examine the record at summary judgment to confirm whether the City has met its burden.

29 C.F.R. Part 541 describes what constitutes executive and administrative duties. Exempt executive duties include "customarily and regularly directing the work of two or more other employees[.]" § 541.100(a)(3). Exempt administrative duties include work that is directly related to "management or general business operations," § 541.200(a)(2), such as public relations, government relations, or database administration, § 541.201(a) and (b). DOL has summarized what tasks performed by fire employees have counted as exempt administrative or executive work under various federal court rulings:

> . . . managerial tasks such as evaluating personnel performance; enforcing and imposing penalties for violations of the rules and regulations; making recommendations as to hiring, promotion, discipline or termination; coordinating

13

> and implementing training programs; maintaining company payroll and personnel records; handling community complaints, including determining whether to refer such complaints to internal affairs for further investigation; preparing budgets and controlling expenditures; ensuring operational readiness through supervision and inspection of personnel; managing the distribution of equipment; maintaining inventory of property and supplies; and directing operations at crime, fire or accident scenes, including deciding whether additional personnel or equipment is needed.

69 Fed. Reg. 22,122, at 22,130. Under a more relaxed duties standard, HCEs are exempt so long as they regularly and customarily perform any one of the duties listed above, "thus eliminating the need for a detailed analysis of the [their] job duties." § 541.601. HCEs also must be employees "whose primary duty includes performing office or non-manual work." § 541.601(d).

The Court finds that operational BCs regularly and customarily perform administrative and executive duties. The record shows they are responsible for evaluating personnel performance, making recommendations on personnel matters, coordinating and implementing training (at least mentoring), deciding where and how to allocate personnel, and directing operations at crime, fire, or accident scenes. These are all administrative or executive duties that on their own would be sufficient to confer exemption under the highly compensated employee standard. These duties also clearly qualify as office or non-manual work. A major part of an operational BC's responsibility for emergency call response entails directing

operations at crime, fire, or accident scenes, and such direction constitutes non-manual work insofar as it involves communication and judgment rather than any physical action.

The Court also finds that administrative BCs, in all their roles, regularly and customarily perform administrative and executive duties. It is undisputed that administrative BCs in Professional Responsibility evaluate personnel performance, make recommendations on personnel matters, and coordinate and implement training. Administrative BCs in Logistics and Community Risk Reduction direct and evaluate subordinates who themselves have subordinate employees. Both administrative BCs in Special Operations as well as in Community Risk Reduction represent the City to other jurisdictions, government agencies, or members of the public, and administrative BCs in Logistics supervise such work. All of these duties constitute non-manual work, which means the HCE duties test applies.

Because at least some of the duties that Plaintiffs perform are administrative and executive in nature, and they otherwise qualify for HCE status, the Court finds that the Battalion Chiefs are exempt from the FLSA. Plaintiff's state law claims also fail as a matter of law because they require the City to be liable under the FLSA.

For the aforementioned reasons, summary judgment should be granted to Defendant on all counts. An appropriate order shall issue.

/s/ Claude M. Hilton
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
June _13_, 2023